1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KIRELL TAYLOR,                        No.  2:21-cv-1330 TLN KJN P

12            Plaintiff,

13        v.

14   S. TERAGAWA,                          FINDINGS & RECOMMENDATIONS

15            Defendant.

16

17   I.  Introduction

18        Plaintiff is a state prisoner proceeding pro se.  Defendant's fully briefed motion for

19   summary judgment is before the court.  As discussed below, the undersigned finds that defendant

20   should be granted qualified immunity.

21   II.  Plaintiff's Allegations

22        In his verified complaint, plaintiff admits that on February 16, 2018, he was attempting to

23   commit suicide by tying a noose around the middle smoke detector affixed to the dayroom ceiling

24   and tying the other end around his neck.  Correctional officers on the bottom tier used pepper

25   spray in an attempt to get plaintiff to comply with their demands.  Officers arrived on the top tier

26   and plaintiff crawled over and held on to the rail with both hands, demanding to talk to the

27   warden and the senior psychologist supervisor.  Nonparty Lt. Hobart ordered various officers to

28   pepper spray plaintiff in the face.  Plaintiff claims no one "employed 'custody protocol' per

                                              1

'suicide prevention and response.'"  (ECF No. 1 at 4.)  After about fifteen minutes elapsed, defendant S. Teragawa used unnecessary and excessive force on plaintiff in violation of the Eighth Amendment by pepper spraying plaintiff in the face while he was having a mental health crisis.  This sprayed plaintiff off the rail, activating the noose.  The pepper spray suffocated plaintiff; eventually his weight caused the noose to snap, and he crashed to the concrete floor on his back.  As a result, plaintiff suffers back pain and periodic seizures, and seeks money damages.

Plaintiff included a supplemental state law claim.  (ECF No. 1 at 13, 23-25.)

III.  Legal Standards for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

////

1    "[A] complete failure of proof concerning an essential element of the nonmoving party's case

2    necessarily renders all other facts immaterial."  Id. at 323.

3        Consequently, if the moving party meets its initial responsibility, the burden then shifts to

4    the opposing party to establish that a genuine issue as to any material fact actually exists.  See

5    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

6    establish the existence of such a factual dispute, the opposing party may not rely upon the

7    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

8    form of affidavits, and/or admissible discovery material in support of its contention that such a

9    dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

10   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

11   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

12   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

13   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

14   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

15   (9th Cir. 1987).

16       In the endeavor to establish the existence of a factual dispute, the opposing party need not

17   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

18   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

19   trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

20   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

21   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

22   amendments).

23       In resolving a summary judgment motion, the court examines the pleadings, depositions,

24   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

25   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

26   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

27   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

28   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

3

1 | predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

2 | Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

3 | demonstrate a genuine issue, the opposing party "must do more than simply show that there is

4 | some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not

5 | lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

6 | Matsushita, 475 U.S. at 586 (citation omitted).

7 | On December 5, 2022 (ECF No. 38-6), plaintiff was advised of the requirements for

8 | opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See

9 | Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d

10 | 409 (9th Cir. 1988).

11 | IV.  Undisputed Facts[1] ("UDF")

12 | At all relevant times, plaintiff was an inmate in the custody of CDCR, and defendant

13 | Teragawa was a correctional officer assigned to California State Prison - Sacramento ("CSP-

14 | SAC"), where plaintiff was housed.

15 | At the time of the February 16, 2018 incident, plaintiff was assigned to a mental health

16 | crisis bed ("MHCB") for mental health care treatment.[2]  (ECF No. 38-3 at 22.)

17 | By February 16, 2018, plaintiff wanted to transfer out of CSP-SAC and move to

18 | California State Prison - Los Angeles County ("CSP-LAC").  (ECF No. 38-3 at 10, 14 (Pl.'s Dep.

19 | at 27, 37).)

20 | Plaintiff asked for the transfer during his meeting with the unit classification committee on

21 | February 14, 2018, but the request was refused.  (ECF No. 38-3 at 11-12 (Pl.'s Dep. at 28-29).)

22 | ////

23 |
24 | [1]  For purposes of summary judgment, the undersigned finds these facts are undisputed.  Where plaintiff failed to properly address defendant's assertion of fact as required, this Court considers

25 | the fact undisputed.  See Fed. R. Civ. P. 56(e)(2).

26 | [2]  The Mental Health Services Delivery System Program Guide for the California Department of Corrections and Rehabilitation provides four levels of mental health care services:  Correctional

27 | Clinical Case Management System ("CCCMS"); Enhanced Outpatient ("EOP"); Mental Health Crisis Bed ("MHCB") and inpatient hospital care.  Coleman v. Brown, 2013 WL 6491529, at *1

28 | (E.D. Cal. Dec. 10, 2013).

4

1    Hoping to force the transfer, plaintiff used his suicide attempt to get the CSP-SAC

2    warden's attention to negotiate a deal for the transfer.  (ECF Nos. 1 at 4; 38-3 at 10-11, 13-14

3    (Pl.'s Dep. at 27-28, 36-37); see also ECF No. 38-5 at 2-3 (Hobart Decl. ¶ 7).)

4    Plaintiff intended to kill himself only if the warden did not promise a transfer out of CSP-

5    SAC.  (ECF No. 38-3 at 14 (Pl.'s Dep. at 37).)

6    Plaintiff had been requesting a transfer to CSP-LAC to give his kidney to his mother but

7    could not do so before her death in 2015.  (ECF No. 38-3 at 10 (Pl.'s Dep. at 27, 29).)

8    In the early morning of February 16, 2018, plaintiff attempted to hang himself in CSP-

9    SAC's B-Facility, 1-Block, A Section.  (ECF Nos. 1 at 4; 38-4 at 2 ¶ 4 (Teragawa Decl.).)

10   Plaintiff created the noose by braiding bedsheets and tied one end to the smoke detector

11   affixed to the ceiling.  (ECF Nos. 1 at 4; 38-3 at 6 (Pl.'s Dep. at 19).)

12   Plaintiff climbed over the guardrail and stood on the ledge on the second tier of A Section

13   with the noose tied around his neck.  (ECF Nos. 1 at 4; 38-4 at 2 (Teragawa Decl. ¶ 4); 38-5 at 2

14   (Hobart Decl. ¶ 6).)

15   Defendant and other correctional staff responded to a radio announcement and an audible

16   alarm regarding plaintiff's suicide attempt.  (ECF Nos. 38-4 at 2 (Teragawa Decl. ¶ 3); 38-5 at 2

17   (Hobart Decl. ¶ 5).)

18   Defendant approached the second tier to engage with plaintiff, fearing plaintiff may jump

19   and activate the noose.  (ECF Nos. 38-4 at 2 (Teragawa Decl. ¶ 5); 38-5 at 2 (Hobart Decl. ¶ 5).)

20   Defendant stood about three feet away from plaintiff and ordered him to come back over

21   the railing several times.  (ECF No. 38-4 at 2 (Teragawa Decl. ¶ 5).)

22   Lt. Hobart gave similar orders for plaintiff to come back over the railing after Hobart

23   arrived on scene.  (ECF Nos. 38-3 at 7 (Pl.'s Dep. at 24); 38-5 at 2 (Hobart Decl. ¶ 7).)

24   Lt. Hobart directed other staff to get cut-down tools, called for medical personnel to report

25   to A Section to respond to any medical emergencies, and ordered staff to lay down several

26   mattresses on the ground floor to break plaintiff's fall in case plaintiff fell or jumped off the

27   ledge.  (ECF No. 38-5 at 2, 3 (Hobart Decl. ¶¶ 8, 14).)

28   ////

1    Multiple officers tried to verbally dissuade plaintiff from going through with his suicide

2    attempt for at least ten minutes, ordering plaintiff to climb back over to the second tier away from

3    ledge.  (ECF No. 38-3 at 7-8 (Pl.'s Dep. at 24-25).)

4    Plaintiff repeatedly refused to obey the lawful orders.  (ECF Nos. 38-3 at 7 (Pl.'s Dep. at

5    24; 38-4 at 2-3 (Teragawa Decl. ¶¶ 5, 6, 8, 9); 38-5 at 2, 3 (Hobart Decl. ¶¶ 7, 9, 16).)

6    During his interaction with defendant and other prison staff, plaintiff became visibly

7    aggressive towards staff.  (ECF Nos. 38-4 at 2 (Teragawa Decl. ¶ 6); 38-5 at 2 (Hobart Decl.

8    ¶ 9).)

9    Defendant contends plaintiff threatened to strike defendant and other staff on scene,

10   eventually attempting to punch Officer D. Garrett.  (ECF Nos. 38-4 at 2 (Teragawa Decl. ¶ 6); 38-

11   5 at 3 (Hobart Decl. ¶ 13).)  Plaintiff denies he attempted to strike or swing his fist at any officers

12   on February 16, 2018.  (ECF No. 40 at 5:18-19.)

13   Despite attempts by officers to deescalate the situation, plaintiff continued to ignore their

14   orders and repeated his threat to jump.  (ECF Nos. 38-3 at 8, 10 (Pl.'s Dep. at 25, 27); 38-5 at 3

15   (Hobart Decl. ¶ 10).)

16   Lt. Hobart perceived the noose to be tightly constructed and wrapped around plaintiff's

17   neck, seemingly strong enough to support plaintiff's weight if he jumped.  (ECF No. 38-5 at 3

18   (Hobart Decl. ¶ 11).)

19   Lt. Hobart feared that continuing the incident any longer would increase plaintiff's

20   likelihood to jump and activate the noose, as well as allowing plaintiff more opportunities to

21   strike nearby staff.  (ECF No. 38-5 at 3 (Hobart Decl. ¶ 10-15).)

22   Lt. Hobart understood the situation to need immediate responses and thus ordered plaintiff

23   to step over the railing and submit to restraints for a final time.  (ECF No. 38-5 at 3-4 (Hobart

24   Decl. ¶ 16-1).)

25   Plaintiff again refused Lt. Hobart's order.  (Id.)

26   To effect custody and prevent plaintiff from injuring himself, Lt. Hobart directed

27   defendant to ready his state-issued oleoresin capsicum ("OC") pepper spray.  (ECF Nos. 38-4 at

28   2-3 (Teragawa Decl. ¶ 8); 38-5 at 3-4 (Hobart Decl. ¶ 16-1).)

6

Plaintiff was ordered to come back over the railing one more time, but plaintiff did not comply.  (ECF Nos. 38-3 at 10 (Pl.'s Dep. at 27); 38-4 at 3 (Teragawa Decl. ¶ 9); 38-5 at 3-4 (Hobart Decl. ¶ 16-1).)[3]

Defendant applied one short, controlled burst of his pepper spray to plaintiff's facial area from about six feet away.  (ECF Nos. 38-4 at 3 (Teragawa Decl. ¶ 9); 38-5 at 3-4 (Hobart Decl. ¶ 16-2).)

The pepper spray struck plaintiff's facial area, which caused plaintiff to let go of his hands from the railing to shield his face.  (ECF Nos. 38-3 at 9 (Pl.'s Dep. at 26); 38-4 at 3 (Teragawa Decl. ¶ 10); 38-5 at 3-4 (Hobart Decl. ¶ 16-2).)

Plaintiff slipped off the second tier's ledge.  The bedsheet snapped and plaintiff fell on the mattresses previously laid on the ground floor at Lt. Hobart's direction.  (ECF No. 1 at 4;[4] 38-4 at 3 (Teragawa Decl. ¶ 10); 38-5 at 4 (Hobart Decl. ¶ 17).)

Even after falling, plaintiff got up and took a fighting stance towards staff nearby.  (ECF No. 38-5 at 4 (Hobart Decl. ¶ 18).)

Responding staff eventually placed plaintiff in restraints, escorted him to medical for triage, and allowed plaintiff to decontaminate with water.  (ECF Nos. 38-4 at 3 (Teragawa Decl. ¶ 11); 38-5 at 4 (Hobart Decl. ¶ 18-20).)

On February 22, 2018, plaintiff was issued a serious rules violation report for assault on a peace officer by means not likely to cause great bodily injury ("GBI") based on the February 18, 2018 incident.  (ECF No. 38-3 at 17-18.)

---

[3]  Both defendant Teragawa and Lt. Hobart declare that they ordered plaintiff to come back over the railing.  In his deposition, in response to the question "[d]id the defendant say anything at all?," plaintiff responded that "[i]t was Lieutenant Hobart that continued the demands for [plaintiff] to come over the rail. . . . Hobart was screaming the demands for [plaintiff] to come over the rail the entire time."  (ECF No. 38-3 at 10 (Pl.'s Dep. at 27).)  In any event, the identity of the officer who ordered plaintiff to come off the railing is not material because it is undisputed that plaintiff refused multiple orders to come off the railing.

[4]  In his complaint, plaintiff claims he "crashed to the concrete floor of the bottom tier onto [his] back."  (ECF No. 1 at 4.)  But in his opposition, plaintiff does not dispute that mattresses were laid on the floor beneath the railing underneath him or that when he fell, he landed on the mattresses, not the concrete floor.  Plaintiff also does not dispute Hobart's claim that after falling, plaintiff got up and took a fighting stance.

1  On February 27, 2018, plaintiff was interviewed by M. Schneider, "Sr. Psych Sup,"

2  Consulting Program Supervisor, who noted plaintiff was "psychiatrically decompensated" at the

3  time of the February 18, 2018 event.  (ECF No. 38-3 at 23.)  In response to the question "[i]n

4  your opinion, was [plaintiff's] behavior so strongly influenced by symptoms of a . . . mental

5  illness . . . that [he] would be better served by documenting this behavior in an alternate manner,"

6  the assessing clinician responded

7
8
9
> YES.  At the time of this event, [plaintiff] was psychiatrically decompensated and was trying to kill himself, and was actively engaged in a suicide attempt with intent to die.  He was unable to control his behavior towards custody staff.

10  (ECF No. 38-3 at 22.)  Plaintiff's "judgment was severely impaired by mental illness."  (Id. at

11  23.)  Subsequently, the rules violation report was modified to "counseling only."  (ECF No. 38-3

12  at 18.)

13  V.  Legal Standards

14  Eighth Amendment - Use of Excessive Force

15  "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places

16  restraints on prison officials, who may not . . . use excessive physical force against prisoners."

17  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  "[W]henever prison officials stand accused of

18  using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry

19  is. . . whether force was applied in a good-faith effort to maintain or restore discipline, or

20  maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

21  To determine whether the use of force was excessive, the court considers the "extent of

22  injury . . ., the need for application of force, the relationship between that need and the amount of

23  force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to

24  temper the severity of a forceful response.'"  Hudson, 503 U.S. at 7 (quoting Whitley v. Albers,

25  475 U.S. 312, 321 (1986)); see also LeMaire v. Maass, 12 F.3d 1444, 1454 (9th Cir. 1993)

26  (considering need for application of measure or sanction complained of, relationship between

27  need and measure or sanction used, extent of any injury inflicted and extent of surrounding threat

28  to safety of staff and inmates); Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979) (guards may

8

use force only in proportion to need in each situation).  While de minimis uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Hudson, 503 U.S. at 9.

VI.  The Parties' Evidence

In addition to his verified complaint, plaintiff provided the following:  RVR Mental Health Assessment dated February 27, 2018 (ECF No. 1 at 5-7); a photocopy of a picture of the tier where the incident occurred (id. at 8); pages from Chapter 10, Suicide Prevention and Response, Mental Health Services Delivery System (2009 Revision) (id. at 9-12); a copy of plaintiff's grievance SAC-B-18-007006 and responses concerning the incident at issue (id. at 16-21); a list of plaintiff's accepted appeals (id. at 22); and a copy of his state tort form and letter denying the claim (id. at 23-25).  With his verified opposition, plaintiff provided defendant's discovery responses.  (ECF No. 40 at 9-23.)

In addition to the declarations by defendant Teragawa and nonparty Lt. Hobart, defendant provided excerpts from plaintiff's deposition (ECF No. 38-3 at 4-15); a copy of the rules violation report issued to plaintiff on February 16, 2018 (id. at 17-21); RVR Mental Health Assessment dated February 27, 2018 (id. at 22-24); February 16, 2018 incident report (id. at 25-33); and correspondence between plaintiff and counsel for defendant (id. at 35-38).  With his reply, defendant provided certified copies of plaintiff's administrative appeal SAC-B-18-00706 and responses, the rules violation report, the February 27, 2018 RVR mental health assessment, and the February 16, 2018 incident report.  (ECF No. 41-1.)

VII.  The Parties' Arguments

Defendant's Motion

Defendant argues that plaintiff's February 16, 2018 suicide attempt threatened plaintiff's wellbeing and undermined institutional discipline, warranting the use of reasonable force in a good faith effort to restore discipline within plaintiff's housing rather than maliciously and sadistically to harm plaintiff.  Defendant contends that plaintiff's repeated threats to kill himself

and his attempts to hit prison staff responding to the attempt justified defendant's use of force.

Moreover, plaintiff's repeated refusal to comply with lawful orders to come back over the railing

and submit to restraints indicated that continued verbal efforts to effect custody of plaintiff would

be futile.  Further, defendant contends he is entitled to qualified immunity because the law was

not clearly established in February 2018 that prison staff cannot use reasonable force in

responding to an inmate's suicide attempt for lawful purposes.

Plaintiff's Opposition

Plaintiff argues the following.  Lt. Hobart issued multiple orders to various racist officers

to pepper spray plaintiff in the face as plaintiff was having a psychiatric meltdown on the ledge of

the second tier with a noose around his neck.  (ECF No. 40 at 2.)  Defendant's response to the

attempted suicide was racially motivated and plaintiff includes references to George Forman and

the Black Lives Matter movement.  Defendant arrived at the scene, issued a few orders to

plaintiff, a suicidal inmate, and then used excessive force within minutes instead of employing a

cool-down period with mental health, citing defendant's interrogatory response.  (ECF No. 40 at

3, citing id. at 11 (interrogatory no. 5 "Approximately two to three minutes").)  But Lt. Hobart

states that "[a]fter unsuccessfully attempting to convince plaintiff to submit to handcuffs for

approximately ten minutes, [Hobart] feared [plaintiff] would intentionally or inadvertently fall

from the upper tier."  (ECF No. 40 at 3, citing ECF No. 38-5 at 3 (Hobart's declaration).)

Plaintiff appears to argue there is a dispute of fact between defendant and Hobart as to whether

the duration of the incident was two or ten minutes.  (ECF No. 40 at 3.)  Plaintiff then claims that

the incident lasted for about 13 minutes until defendant took a stance in front of plaintiff on the

opposite side of the rail.  At that time, plaintiff "demanded to know:  'How many niggers have

you maliciously lynched?'" to which defendant allegedly replied, "Just you," and then

"unnecessarily pepper sprayed [plaintiff] in the face off of the second tier to wantonly activate the

noose around [plaintiff's] neck."  (ECF No. 40 at 4.)  Plaintiff points to his prison grievance in

which he claimed that "[t]his appeal exposes [defendant] failed to kill [plaintiff] on 02-16-2018

when [he] pepper sprayed and pushed [plaintiff] off the top tier to activate the noose."  (ECF No.

40 at 5, citing ECF No. 1 at 17.)

1   Further, plaintiff objects that nonparty Lt. Hobart declares he used his cellphone to video

2   record plaintiff, yet in response to plaintiff's request to produce any video footage of the incident,

3   defendant claimed he was not in possession of any video footage of plaintiff's suicide attempt on

4   February 16, 2018.  (ECF No. 40 at 3, citing id. at 22 (RPD No. 1.).)  Plaintiff claims the video

5   will not be produced because it will show defendant removed one of plaintiff's hands from the

6   rail after defendant pepper sprayed plaintiff in the face while plaintiff's other hand was wiping his

7   face.  Plaintiff alleges that "defendant had an evil desire to see the noose activated" and knew that

8   pepper spraying plaintiff in the face would eventually cause plaintiff to let go of the rail but did

9   not wait and removed plaintiff's hand from the rail.  (ECF No. 40 at 5.)

10   Plaintiff denies he attempted to strike or swing his fist at any officers on February 16,

11   2018.  (ECF No. 40 at 5:18-19.)  Plaintiff asserts that two cases demonstrate defendant is not

12   entitled to summary judgment.  First, Garcia v. Colunga, 2008 WL 817094 (C.D. Cal. Mar. 21,

13   2008), supports plaintiff's argument that a jury could reasonably conclude that defendant's

14   application of force was unnecessarily excessive under the circumstances and not undertaken in a

15   good faith effort to restore discipline or order, precluding summary judgment.  Second, Bragg v.

16   Russell,[5] 2006 WL 2785075, at *2-4 (N.D. Cal. Sept. 26, 2006), supports plaintiff's argument

17   that "summary judgment on an excessive force claim is improper where the parties dispute

18   whether plaintiff verbally or physically refused to obey a 'stupid' order; under such

19   circumstances, whether force was necessary, and if so, whether permissible bounds were

20   exceeded, were questions for the jury."  (ECF No. 40 at 6.)  In both cases, the courts found a

21   material dispute of fact as to whether the prisoner's conduct warranted the use of force.  Id.

22   When prison officials maliciously and sadistically use force to cause harm, contemporary

23   standards of decency which give meaning to the Eighth Amendment are always violated, whether

24   or not a significant injury occurred, and defendant should have known his response violated

25   contemporary standards of decency because plaintiff was holding on to the rail for support.  (ECF

26   _____

27   [5]  Plaintiff incorrectly identifies this case as Vega v. Alameida.  (ECF No. 40 at 6.)  There was a
    decision with that title, but it was from the Eastern District of California and ruled that discovery
    documents were not to be filed with the court until at issue and denied Vega's request for

28   appointment of counsel.  Vega v. Alameida, 2006 WL 1068883 (E.D. Cal. Apr. 21, 2006).

1   No. 40 at 6.)

2       Defendant's Reply

3       Defendant counters as follows.  Plaintiff offered no evidence substantiating his claim that

4   defendant used excessive force in responding to plaintiff's February 2018 suicide attempt, failing

5   to show that defendant used force maliciously and sadistically for the very purpose of causing

6   harm.  Plaintiff failed to rebut defendant's evidence showing that the circumstances at the time

7   justified defendant's controlled use of pepper spray.

8       Plaintiff's repeated contentions that defendant expressed his racially induced intent to

9   harm plaintiff are refuted by defendant's discovery responses; defendant denied calling or

10  addressing plaintiff by any derogatory terms and denied hearing plaintiff make any statements

11  regarding any correctional officers' intent to lynch plaintiff sadistically or maliciously.  (ECF No.

12  41 at 2, citing ECF No. 40 at 12-13.)  Plaintiff submitted no evidence, other than his own

13  conclusory allegation, that defendant wanted to "maliciously lynch" plaintiff or any other black

14  inmates.  (ECF No. 41 at 2.)  Conclusory allegations are insufficient to defeat summary judgment,

15  and courts may disregard a plaintiff's self-serving and conclusory statements, if no other evidence

16  supports them, which is the case here.  (ECF No. 41.)

17      Plaintiff's attempt to create a genuine dispute of material fact as to the duration of the

18  incident is unavailing because the parties do not disagree on the duration.  (ECF No. 41 at 2-3

19  citing ECF No. 38-3 at 7-8 (Pl.'s Dep. at 24-25) (at least fifteen to twenty minutes); ECF No. 38-

20  5 at 3 (Hobart Decl.)[6] (at least ten minutes).  Also, there is no dispute as to whether plaintiff's use

21  of pepper spray was one short, controlled burst, which unfortunately caused plaintiff to fall from

22  the railing.  While plaintiff also argues that there is video showing defendant pushed plaintiff off

23  the railing after pepper spraying him on February 16, 2018, defendant does not possess any video

24  footage.  (ECF No. 41 at 3.)  And no evidence substantiates plaintiff's bare assertion that his

25  inmate appeal alleged defendant pushed him off the railing.  (ECF No. 41 at 3, citing id. at Ex. 1.)

26  Importantly, plaintiff offered no evidence substantiating such claim in his opposition.

27

28  [6]  Defendant cites ¶ 17, but the ten minute reference is in ¶ 14 on page 3.

1  ////

2       Plaintiff's unsupported statement that he did not try to physically attack any prison staff

3  during the suicide attempt does not sufficiently refute credible evidence to the contrary.  (ECF

4  No. 41 at 3, comparing ECF No. 40 at 5 (Pl.'s Opp'n) with ECF No. 41 at 16-38 (Decl.

5  Custodian).)  Moreover, plaintiff cannot dispute that he posed a danger to himself and others on

6  February 16, 2018, which prompted defendant's justified use of force to protect plaintiff and

7  uphold prison security.  (ECF No. 41 at 3.)

8       Further, plaintiff's unruly behavior justified defendant's use of force under then-governing

9  prison regulations and policies.  (ECF No. 41 at 3, citing ECF No. 38-4 at 3-4 (Teragawa Decl.).)

10  Defendant was required to ensure plaintiff's safety by timely responding to the suicide attempt

11  and retained the discretion to use reasonable and necessary force in response.  (ECF No. 41 at 3.)

12  Defendant acted within his official duties by using force only after plaintiff consistently failed to

13  stop his suicide attempt and attempted battery on staff.  (ECF No. 41 at 3-4, 5 (Cust. Decl., Ex.

14  2).)  The two cases relied upon by plaintiff are unavailing because both courts observed that a

15  prisoner's refusal to obey lawful commands would justify correctional staff's use of some force to

16  ensure order and discipline, which is indisputably the case here.  (ECF No. 41 at 4.)

17       Finally, defendant is entitled to qualified immunity because no reasonable officer in

18  defendant's position on February 16, 2018, would have known that following a superior's order

19  to pepper spray an unruly plaintiff would violate the Constitution.  (ECF No. 41 at 4.)  Defendant

20  argues that federal courts have long deferred to prison security measures taken in response to an

21  actual confrontation with "riotous inmates."  (Id.) (quoting Whitley, 475 U.S. at 322.  Courts have

22  also repeatedly affirmed prison staff's use of force in such situations.  (ECF No. 41 at 4.)  And

23  prison officials may use a nonlethal amount of chemical agents on prisoners for penological

24  reasons.  (ECF No. 41 at 4.)  Defendant has established, with irrefutable evidence, that plaintiff

25  attempted to commit battery on staff during the February 2018 suicide attempt.  (ECF No. 41 at 4)

26  (citing ECF No. 41-1-2 (Cust. Decl. Ex. 2).)  In that moment, established laws on how prison

27  officials may handle violent inmates would not put any reasonable prison official on notice that

28  pepper spraying plaintiff would violate the Eighth Amendment.  Plaintiff cites no controlling

13

1  authority precluding prison officials from using chemical agents on an inmate attempting to

2  commit suicide or experiencing mental duress, and there is none.  Plaintiff's "presumptive and

3  distinguishable hypothetical" concerning a person attempting suicide on the Golden Gate bridge

4  does not preclude qualified immunity.  (ECF No. 41 at 5, citing ECF No. 40 at 2.)  Even

5  assuming, arguendo and in retrospect, that defendant failed to properly implement an adequate

6  suicide response, defendant still would not have violated plaintiff's clearly established right.

7  (ECF No. 41 at 5.)

8  VIII.  <u>Discussion</u>

9       In his opposition, plaintiff now claims a video would show that after defendant pepper

10 sprayed plaintiff in the face, defendant removed one of plaintiff's hands from the rail while

11 plaintiff was wiping his face with the other hand.  (ECF No. 40 at 5:6-9.)  In his initial grievance,

12 plaintiff wrote that as defendant pepper sprayed plaintiff in the face "he also removed my hands

13 from the rail."  (ECF No. 1 at 17; 41-1 at 8.)

14      However, in plaintiff's deposition, he testified that "I did not jump off the tier, I did not

15 step off the tier.  I had to bring my hands to my face because my face was covered in pepper

16 spray, and thus the noose was activated."  (ECF No. 38-3 at 9 (Pl.'s Dep. at 26).)  Later, he again

17 reiterated that defendant pepper sprayed plaintiff off the tier.  (ECF No. 38-3 at 13 (Pl.'s Dep. at

18 36).)  Such verified statements comport with plaintiff's verified statements in his complaint that

19 defendant "sprayed plaintiff off the rail."  (ECF No. 1 at 4.)  In his verified pleading, plaintiff

20 does not allege that defendant removed one or both of plaintiff's hands from the rail after pepper

21 spraying plaintiff.

22      Plaintiff cannot create a material dispute of fact by arguing new facts contrary to his own

23 statements made under oath.  "The general rule in the Ninth Circuit is that a party cannot create

24 an issue of fact by an affidavit contradicting his prior deposition testimony."  <u>Van Asdale v. Int'l</u>

25 <u>Game Tech.</u>, 577 F.3d 989, 998 (9th Cir. 2009); <u>Kennedy v. Allied Mut. Ins. Co.</u>, 952 F.2d 262,

26 266 (9th Cir. 1991) ("[I]f a party who has been examined at length on deposition could raise an

27 issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would

28 greatly diminish the utility of summary judgment as a procedure for screening out sham issues of

fact.")  Here, plaintiff's verified complaint and deposition testimony are consistent.  Plaintiff

simply argues such additional new fact in his opposition.[7]  (ECF No. 40 at 5.)  To the extent

plaintiff's additional claim in his opposition is verified, the undersigned disregards such claim as

a sham affidavit because it contradicts plaintiff's deposition testimony that he was pepper sprayed

off the railing, as well as his consistent allegations in his verified complaint.  Van Asdale, 577

F.3d at 998-999 (the sham affidavit rule can only be applied when the inconsistency between the

prior testimony and subsequent affidavit is clear and unambiguous).  Moreover, there is no

evidence that his failure to include such statements in his deposition or pleading are based on an

honest mistake or supported by newly discovered evidence.  Thus, the undersigned does not find

that there is a material dispute of fact as to how plaintiff fell from the rail.

Moreover, no video was submitted on behalf of either party.[8]  Defendant responded to

request for production number one that he is not in possession of any video footage of plaintiff's

suicide attempt on February 16, 2018.  (ECF No. 40 at 22.)  In his declaration, nonparty Lt.

Hobart declares that he recorded some of the incident on his cell phone.  (ECF No. 38-5 at 2.)

However, after defendant Teragawa unsuccessfully attempted to engage plaintiff in conversation,

and after plaintiff did not comply with orders to step back over the handrail, Hobart stopped

recording and moved from the lower tier to the upper tier in an attempt to deescalate the situation.

After additional verbal efforts were made to get plaintiff to come back over the handrail,

defendant dispersed one short burst of OC pepper spray striking plaintiff in the face.  (ECF No.

38-5 at 4.)  Hobart's declaration makes clear that Hobart did not record the subsequent pepper

spraying of plaintiff by defendant Teragawa.  Importantly, there is no evidence that defendant

Teragawa recorded the incident, or that Teragawa possessed nonparty Hobart's cell phone.

---

[7]  In addition, although his opposition is signed under penalty of perjury, he qualifies such statement by writing "except as to that stated on information and belief or that which is a legal conclusion and as to those matters, I believe them to be true."  (ECF No. 40 at 7.)

[8]  In his opposition, plaintiff objects to defendant's response to plaintiff's request to produce such video footage.  (ECF No. 40 at 3.)  However, as argued by defendant, plaintiff was required to file any motion to compel discovery responses on or before July 29, 2022.  (ECF No. 28 at 5.)  In any event, defendant Teragawa's response is not rebutted by Hobart's claim that Hobart recorded part of the incident on his own cell phone.

1   ////

2          In addition, plaintiff claims there are discrepancies in the time frame involved.  Plaintiff

3   points to defendant's response that he witnessed plaintiff engage in an attempt to commit suicide

4   for approximately two to three minutes.  (ECF No. 40 at 3, citing ECF No. 40 at 11 (interrogatory

5   no. 5).)  Lt. Hobart declares that after unsuccessfully attempting to convince plaintiff to submit to

6   handcuffs for approximately ten minutes, Hobart feared plaintiff would fall from the upper tier.

7   (ECF No. 38-5 at 3.)  But, as argued by defendant, the record reflects no material dispute as to the

8   duration of the incident.  Hobart's declaration suggests that the duration was a minimum of ten

9   minutes.  Plaintiff testified that "for approximately 15 to 20 minutes they continued to demand

10  that [plaintiff] come over the rail."  (ECF No. 38-3 at 7 (Pl.'s Dep. at 24.)  "Over a period of 15 to

11  20 minutes, . . . at least approximately 25 to 40 times they begged [plaintiff] to come over the

12  tier."  (ECF No. 38-3 at 8 (Pl.'s Dep. at 25.)  This record demonstrates that over a period of at

13  least ten minutes, multiple efforts were made to persuade plaintiff to voluntarily come off the rail,

14  and plaintiff admits that he refused all such efforts.  (ECF No. 38-3 at 8 (Pl.'s Dep. at 25).)  Thus,

15  the undersigned finds that any differences in the parties' recollections as to the duration of the

16  incident are not material to the question of whether defendant used excessive force.

17         On the other hand, the undersigned disagrees with defendant that plaintiff's statement that

18  he did not try to physically attack any prison staff during the suicide attempt is unsupported and

19  does not refute the "credible evidence" in the Custodian's exhibit 2.  Defendant apparently refers

20  to the rules violation report.  (ECF No. 41 at 3.)  However, plaintiff was present during the

21  incident and may testify as to what he did or did not do at that time.  While defendant and other

22  witnesses may testify to the contrary, it is not appropriate on summary judgment to weigh the

23  evidence or rule on a party's credibility.  That is solely within the province of the jury.

24         That said, in determining whether defendant's use of force was excessive, the undersigned

25  finds it undisputed that plaintiff's suicide attempt presented an emergency situation which, in

26  turn, supported defendant's use of force under the circumstances.  See Jordan v. Gardner, 986

27  F.2d 1521, 1528 (9th Cir. 1993) (en banc) (the absence of an emergency situation is probative of

28  whether force was applied maliciously or sadistically).  Plaintiff was dangling off the second tier,

threatening to hang himself, posing a risk to himself and others, as well as disrupting prison

discipline and order.  Such emergency situation posed a threat reasonably perceived by defendant

and responding prison staff.  While plaintiff disputes that he was attempting to strike other

officers, plaintiff's actions in attempting suicide by jumping off the tier alone presented a risk to

plaintiff, other inmates and prison staff, and disrupted prison discipline and order.  Defendant had

an obligation to prevent plaintiff from committing suicide.  See, e.g., Moore v. Hunter, 847 F.

App'x 694 (11th Cir. 2021) (it was not repugnant to the conscience of mankind that officer might

use chemical spray against prisoner in order to prevent his attempted suicide, even if a more

restrained response might have been preferable, and after officer sprayed prisoner, prisoner was

taken to the decontamination shower and then seen by the prison medical staff.); Gibson v.

Flemming, 837 F. App'x 860 (3d Cir. 2020) (use of force with OC spray was required to prevent

suicidal prisoner from hurting himself and did not constitute excessive force).

Importantly, it is undisputed that plaintiff refused to comply with multiple orders to come

back over the railing.  Plaintiff's conceded refusals distinguish his case from Garcia, 2008 WL

817094, *13, and Bragg, 2006 WL 2785075, *4, in which both courts noted a prisoner's refusal to

obey lawful commands would justify a reasonable use of force to restore discipline and order.

Such multiple orders constituted prison staff's efforts to avoid and temper the use of force.

Further, it is undisputed that plaintiff refused to comply with an order to come back over the

railing immediately before Lt. Hobart ordered defendant to pepper spray plaintiff.

Defendant tempered the use of force by deploying one short burst of pepper spray.

Plaintiff does not dispute that defendant deployed only one burst.  Plaintiff adduced no competent

evidence demonstrating that defendant acted maliciously or sadistically for the very purpose of

causing harm.  Plaintiff attempts to attribute racial animosity to defendant and other responding

officers, but plaintiff's claims are speculative and not based on competent evidence.  Indeed,

defendant declares he "never had any troubles during [his prior] interactions with [plaintiff]"

(ECF No. 38-4 at 4), and plaintiff did not refute such evidence.  It is undisputed that Lt. Hobart

ordered defendant to pepper spray plaintiff, and there is no dispute as to the modest quantum of

pepper spray deployed by defendant Teragawa.

17

1 | ////

2 | Further, it is undisputed that plaintiff was allowed to wash the pepper spray off following

3 | the incident, and he received medical care thereafter.

4 | As to injuries, plaintiff provided no competent medical evidence demonstrating he

5 | sustained serious injuries, despite falling from the second tier.  Nonparty Hobart likely spared

6 | plaintiff from serious injury by ordering mattresses to be placed under the second tier.

7 | Finally, under these emergency circumstances, it is important for the court to defer to

8 | responding prison staff.  See Whitley, 475 U.S. at 321-22.  Corrections officers rarely have time

9 | for reflection; instead, the decision to use force must be made "'in haste, under pressure, and

10 | frequently without the luxury of a second chance.'"  Hudson, 503 U.S. at 6 (quoting Whitley, 475

11 | U.S. at 320).  Surely, in the prison setting, inmates are not allowed to pick and choose those

12 | orders they will obey.  Correctional officers are not required to concede to the demands of

13 | inmates or wait them out in order to avoid the use of force.  Soto v. Dickey, 744 F.2d 1260, 1270

14 | (7th Cir. 1984) ("experience and common sense establish that a prison cannot be operated in such

15 | a way.").  Indeed, the Ninth Circuit has held that the policy of spraying prisoners with pepper

16 | spray for refusing to follow directions falls within the wide ranging zone of deference accorded to

17 | prison officials in shaping preventive measures intended to reduce incidents of breaches of prison

18 | discipline.  Stewart v. Stewart, 60 F. App'x 20, 22 (9th Cir. 2003).  Thus, plaintiff's undisputed

19 | refusal to obey orders demonstrates that defendants were justified in using some measure of force

20 | because plaintiff did not readily comply with the officers' repeated orders.

21 | Of course, most of the legal authorities approving the reasonable use of force with a

22 | modest quantum of pepper spray do not involve a suicidal inmate.  In hindsight, it is not clear that

23 | it would be appropriate to pepper spray a suicidal inmate dangling off the railing because it was

24 | foreseeable that any use of pepper spray, especially to the inmate's face, would cause the inmate

25 | to fall off the tier.  Indeed, Lt. Hobart took precautions to place mattresses below the tier because

26 | plaintiff's potential fall was foreseeable.  But on the other hand, it is unclear what alternative

27 | means were available to safely remove plaintiff from the railing and restore order.  Plaintiff

28 | contends defendant should have followed suicide protocol, calling in mental health professionals

1   or using a cooling off period rather than using force.  Plaintiff was housed in a mental health

2   crisis bed and was obviously engaged in suicidal behavior, and it is undisputed that at the time

3   plaintiff was psychiatrically decompensated and "unable to control his behavior towards custody

4   staff."  But given plaintiff's precarious position hanging off the railing of the second tier, as well

5   as his decompensated mental state, it is unclear there was time to call in mental health

6   professionals or that such professionals could have quickly deescalated the situation, particularly

7   where plaintiff admits he refused to comply with multiple orders to come off the railing and was

8   insisting that his demands be met.  Moreover, in his deposition, plaintiff testified that he would

9   only have climbed back over the railing if the warden had come and promised plaintiff the

10   transfer he had been requesting.  Indeed, plaintiff denied he would have climbed back over the

11   railing if Dr. Schneider had promised to give plaintiff the mental health services he would like.

12   (ECF No. 38-3 at 14 (Pl.'s Dep. at 37).)

13        While one may now, in hindsight, question the wisdom of using pepper spray on a suicidal

14   inmate hanging from the railing, it is undisputed that only a short burst of pepper spray was

15   deployed, and prison staff placed mattresses below the tier to cushion plaintiff's fall in the event it

16   occurred.  See Thomas v. Lewis, 988 F.2d 122, *1 (9th Cir. 1993) (quoting the district court:

17   "while one may question the necessity and the wisdom of employing the forced cell extraction in

18   the first place, the videotape indicates that a bare minimum of force was used in exercising this

19   option.").  Such evidence fails to demonstrate that defendant used force sadistically or

20   maliciously for the very purpose of harming plaintiff rather than in an effort to restore prison

21   order and discipline.  See Monday v. Oullette, 118 F.3d 1099, 1104-05 (6th Cir. 1997) (upholding

22   police officer's use of pepper spray to subdue an unarmed individual the police feared would

23   injure himself or commit suicide if not taken into custody); see also Farmer v. Hayman, 2008 WL

24   141104 (D. N.J. 2008) (finding need for use of force was urgent based on threat to safety of staff

25   and inmates posed by inmate's suicide attempt and prisoner conceded officers attempted to

26   temper forceful response by multiple orders to stop the attempt before force was used).

27        The undersigned disagrees that there are disputed issues of material fact precluding entry

28   of summary judgment in defendant's favor.  It is undisputed that following plaintiff's repeated

19

1    refusals to come off the railing, defendant deployed one short burst of pepper spray to plaintiff's

2    face, which unfortunately caused plaintiff to fall from the second tier.  Under the circumstances,

3    no reasonable jury would find defendant's use of force was excessive.

4    IX.  Qualified Immunity

5          In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to

6    determine whether qualified immunity exists.  First, the court asks: "Taken in the light most

7    favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated

8    a constitutional right?"  Id. at 201.  If "a violation could be made out on a favorable view of the

9    parties' submissions, the next, sequential step is to ask whether the right was clearly established."

10   Id.  To be "clearly established," "[t]he contours of the right must be sufficiently clear that a

11   reasonable official would understand that what he is doing violates that right."  Id. at 202 (internal

12   quotation marks and citation omitted).  Accordingly, for the purposes of the second prong, the

13   dispositive inquiry "is whether it would be clear to a reasonable officer that his conduct was

14   unlawful in the situation he confronted."  Id.  Courts may choose which prong of the analysis to

15   address first.  See Pearson, 555 U.S. at 236-39.

16         As discussed above, the undersigned finds that defendant did not violate the Eighth

17   Amendment by using excessive force.  However, even assuming, arguendo, that defendant's

18   actions violated the Eighth Amendment, defendant should be granted qualified immunity based

19   on the second prong of the qualified immunity test.

20         Defendant is entitled to qualified immunity because it would not be "clear to a reasonable

21   officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 201-

22   02.  In light of the "wide-ranging deference" accorded prison officers in the face of a disruption in

23   prison security, Whitley, 475 U.S. at 321, an officer facing the unique circumstances that

24   confronted defendant Teragawa would have believed that the use of one short burst of pepper

25   spray to subdue plaintiff was lawful.  Despite the strides made in acknowledging and more

26   appropriately addressing mental health crises in California state prisons,[9] there is no clearly

27

28   ⁹  See, generally, Coleman v. Newsom, 2:90-cv-0520 KJM DB P (E.D. Cal.).

established right showing beyond doubt that correctional officers may not use pepper spray on mentally ill prisoners engaged in suicidal behavior.  Indeed, the "law is unclear regarding the parameters of the permissible use of pepper spray to address inmates who disobey or interfere with officers in the performance of their duties." Jennings v. Hays, 2011 WL 1480038, at *9 (D. Az. Apr. 19, 2011); Brown v. Williams, 2011 WL 386852, at *5 (E.D. Cal. Apr. 8, 2011) ("There is little Supreme Court and Ninth Circuit published precedent that addresses the use of chemical agents to maintain prison discipline, let alone the use of chemical agents to establish compliance with a lawful order.") (citations omitted); Howard v. Nunley, 2010 WL 3785536, at *4 (E.D. Cal. Sept. 24, 2010), aff'd, 465 F. App'x 669 (9th Cir. 2012) ("Supreme Court and published Ninth Circuit precedent have little to say about the appropriate use of pepper spray or similar agents to enforce prison discipline.").

Therefore, even if defendant Teragawa's conduct violated the Eighth Amendment, it would not have been clearly established to a reasonable officer in the situation defendant confronted, that deploying one short burst of pepper spray on plaintiff, who was attempting suicide, was not permitted.  Accordingly, defendant is entitled to qualified immunity.

X.  Supplemental State Law Claim

Based on the above recommendation, the undersigned declines to recommend that the court exercise supplemental jurisdiction over plaintiff's state law claim and recommends dismissing it without prejudice.  Wade v. Regional Credit Ass'n, 87 F.3d 1098, 1101 (9th Cir. 1996).

XI.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 38) be granted, and the Clerk of the Court be directed to enter judgment.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

21

1 │ objections shall be filed and served within fourteen days after service of the objections.  The

2 │ parties are advised that failure to file objections within the specified time may waive the right to

3 │ appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

4 │ Dated:  July 5, 2023

5

6 │ KENDALL J. NEWMAN
  │ UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28