UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRELL TAYLOR,<br><br>        Plaintiff,<br><br>    v.<br><br>S. TERAGAWA,<br><br>        Defendant. | No. 2:21-cv-01330-TLN-KJN<br><br>**ORDER** |

This matter is before the Court on Defendant S. Teragawa's ("Defendant") Motion for Summary Judgment. (ECF No. 38.) Plaintiff Kirell Taylor ("Plaintiff"), a state prisoner proceeding pro se, filed an opposition. (ECF No. 40.) Defendant filed a reply. (ECF No. 41.)

The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. On July 05, 2023, the magistrate judge filed findings and recommendations herein which were served on all parties, and which contained notice to all parties that any objections to the findings and recommendations were to be filed within fourteen days. Neither party filed objections to the findings and recommendations. The Court presumes that any findings of fact are correct. *See Orand v. United States*, 602 F.2d 207, 208 (9th Cir. 1979). The magistrate judge's conclusions of law are reviewed *de novo*. *See Britt v. Simi Valley Unified School Dist.*, 708 F.2d 452, 454 (9th Cir. 1983). Having carefully reviewed the record, the Court declines to adopt the findings and recommendations. (ECF No. 44.)

For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendant's motion.

### I.     FACTUAL AND PROCEDURAL BACKGROUND[1]

This case arises from Plaintiff's attempted suicide on February 16, 2018. At the time, Plaintiff was an inmate in the custody of California Department of Corrections and Rehabilitation ("CDCR"), and Defendant was a correctional officer assigned to California State Prison – Sacramento ("CSP-SAC") where Plaintiff was housed in a mental health crisis bed ("MHCB") for mental health care treatment.[2] (ECF Nos 38-1 at 1–2; 38-3 at 22.)

The night before the incident, Plaintiff braided a bedsheet to create a noose. (ECF No. 38-3 at 19.) The following morning, Plaintiff tied one end of the noose to the smoke detector affixed to the ceiling in the dayroom in CSP-SAC's B-Facility, A Section. (*Id*. at 6.) Plaintiff then put the other end of the noose around his neck and climbed over the guardrail and stood on the ledge on the second tier of A Section. (ECF No. 38-4 at 2.)

Defendant and other correctional staff responded to a radio announcement and alarm regarding Plaintiff's suicide attempt. (*Id*.) Non-Defendant Lieutenant Hobert observed Plaintiff and believed the noose was tightly constructed and seemingly strong enough to support Plaintiff's weight if he jumped. (ECF No. 38-5 at 3.) The officers approached Plaintiff on the second tier cautiously, fearing Plaintiff may jump and activate the noose. (ECF No. 38-4 at 2.)

Defendant stood about three feet away from Plaintiff and ordered him to come back over the guardrail several times. (ECF No. 38-4 at 2.) Lieutenant Hobert gave similar orders. (*Id*.) Lieutenant Hobert directed other staff to get cut down tools and called for the A-Facility Treatment and Triage nurse to report to the scene to provide medical treatment to Plaintiff in the event he hung himself or fell to the lower tier. (ECF No. 38-5 at 2.)

---

[1]    The following facts are undisputed unless otherwise noted.

[2]    The Mental Health Services Delivery System Program Guide for the California Department of Corrections and Rehabilitation provides four levels of mental health care services: (1) Correction Clinical Case Management System ("CCCMS"); (2) enhanced outpatient; (3) mental health crisis bed; and (4) hospital care. *Coleman v. Brown*, No. CIV. S-90-520 LKK, 2013 WL 6491529, at *1 (E.D. Cal. Dec. 10, 2013).

2

For at least the next ten minutes, multiple officers tried to verbally dissuade Plaintiff from going through with his suicide attempt and ordered him to climb back over to the second tier away from the ledge. (ECF No. 38-3 at 7–8.) Plaintiff repeatedly refused to obey the officers' orders by not coming back over the guardrail to the second tier. (*Id*. at 7.)

Defendant contends Plaintiff then became visibly aggressive towards staff and Plaintiff threatened to strike Defendant and other officers on scene, eventually attempting to punch Officer D. Garret.³ (ECF No. 38-4 at 2.) This caused Plaintiff to lurch away from the guardrail several times and lose his grip on the guardrail before reaching out for the guardrail again to regain his balance. (*Id*.)

Lieutenant Hobert feared if the situation continued, Plaintiff would intentionally or inadvertently fall from the ledge. (ECF No. 38-5 at 3–4.) He ordered Plaintiff to again step over the guardrail and submit to handcuffing. (*Id*.) Plaintiff again refused to comply with Lieutenant Hobert's order. (*Id*.) Lieutenant Hobert then directed Defendant to prepare and utilize his oleoresin capsicum ("OC") pepper spray. (*Id*.) Defendant applied one burst of his pepper spray to Plaintiff's facial area from about six feet away. (ECF No. 38-4 at 3.) The pepper spray struck Plaintiff's face, which caused Plaintiff to let go of the guardrail to shield his face. (ECF No. 38-3 at 9.) Plaintiff lost his balance, and he slipped off the second tier's ledge. (ECF No. 1 at 4.) The noose snaped, and Plaintiff fell from the second tier onto mattresses laid out by officers on the lower tier. (*Id*.) Responding staff then placed Plaintiff in restraints, escorted him to medical for triage, and allowed Plaintiff to decontaminate with water. (ECF No. 38-4 at 3.) As a result of the fall, Plaintiff claims he suffers from back pain and periodic seizures. (ECF No. 1 at 3.)

In a Mental Health Assessment prepared after the incident, M. Schneider, a Senior Psychiatric Supervisor stated, "At the time of the event, [Plaintiff] was psychiatrically decompensated and was trying to kill himself, and was actively engaged in a suicide attempt with intent to die. He was unable to control his behavior towards custody staff." (ECF No. 38-3 at 2.)

///

---

³ Plaintiff disagrees and contends he did not make any physical gestures towards officers because it would have caused him to let go of the railing. (ECF No. 38-3 at 9.)

Plaintiff filed the instant action on July 28, 2021, alleging Defendant violated his Eighth Amendment rights and his rights under Article 1, Section 17 of California's Constitution.  (ECF No. 1.)  Defendant filed the instant motion for summary judgment on December 5, 2022.  (ECF No. 38.)

### II.     STANDARD OF LAW

Summary judgment is appropriate when the moving party demonstrates no genuine issue of any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id*. at 324 (internal quotation marks omitted).  Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968).  The opposing party may not rely upon the denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, *Anderson v. Defendant Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id*. at 251–52.

4

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The opposing party's evidence is to be believed and all reasonable inferences must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. at 587.

### III.    ANALYSIS

Defendant moves for summary judgment as to all of Plaintiff's claims and argues qualified immunity otherwise shields Defendant from liability. (ECF No. 38-1 at 1.) The Court will address each of Defendant's arguments in turn.

#### A.    Eighth Amendment Violation

Defendant argues he did not violate Plaintiff's Eighth Amendment rights because he did not pepper spray Plaintiff to cause him undue harm. (ECF No. 38-1 at 6.) Rather, Defendant argues he pepper sprayed Plaintiff to "protect Plaintiff and prevent further disruption to institutional order." (*Id*. at 7.) This argument is unpersuasive.

5

A prison official's use of force constitutes cruel and unusual punishment when it inflicts "unnecessary and wanton pain and suffering." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). This inquiry will turn on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. A Court must be hesitant "to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of second chance." *Marquez v. Gutierrez,* 322 F.3d 689, 692 (9th Cir. 2003). Therefore, to determine whether a particular use of force evinces wantonness, a court must consider five factors: (1) the objective need for force; (2) the relationship between any such need and the amount of force actually used; (3) the threat reasonably perceived by the correctional officer; (4) whether the officer took efforts to temper the severity of his response; and (5) the extent of the inmate's injury. *Id*.

First, there is a triable issue of material fact as to whether Defendant needed to pepper spray Plaintiff, given it appears from the record Defendant or other responding officers could have cut down the noose to deescalate the situation per the CDCR Suicide Prevention and Response protocol. (*See* ECF No. 1 at 12.) The record makes clear Lieutenant Hobert ordered staff to get cut down tools to cut down Plaintiff's noose when he first saw Plaintiff standing on the ledge of the second tier with a noose around his neck. (ECF No. 38-5 at 2–3.) However, the record is silent as to why these tools were not used during the ten to twenty minutes Defendant and other officers negotiated with Plaintiff before Defendant pepper sprayed Plaintiff.[4] If Defendant's goal was to protect Plaintiff from hanging himself, a jury could find cutting down the noose could have accomplished this goal without using force.

Second, reasonable minds could differ as to whether using pepper spray to subdue an inmate who is standing on a ledge with a noose around his neck was a proportionate or appropriate response. While the Eighth Amendment does not prohibit a prison official from using a nonlethal quantity of a chemical agent to prevent a perceived future harm, it does not follow

---

[4] It is unclear from the record how close officers would have to get to Plaintiff to cut down the noose or whether such action would have jeopardized officer safety. These issues, however, can be resolved at trial.

1    that a prison official may use a chemical agent on an inmate where there is an obvious risk such

2    use could cause significant harm to an inmate, including death.  *See Clement v. Gomez*, 298 F.3d

3    898, 903–904 (9th Cir. 2002) (upholding two bursts of pepper spray to stop a fight between two

4    inmates inside a cell did not violate Eighth Amendment).  Moreover, "the Eighth Amendment

5    requires clear and adequate constraints on the amount, if any, of pepper spray that may be used on

6    mentally ill inmates."  *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1079 (E.D. Cal. 2014).  It is

7    undisputed, "[a]t the time of the event, [Plaintiff] was psychiatrically decompensated and was

8    trying to kill himself, and was actively engaged in a suicide attempt with intent to die."  (ECF No.

9    38-3 at 2.)  Thus, a jury could find the use of pepper spray under these circumstances runs afoul

10   of these constraints, especially given the risk Plaintiff could hang himself or fall to the first tier if

11   pepper sprayed.

12          Third, there is a triable issue of material fact as to whether Plaintiff posed a threat to

13   Defendant and others, such that Defendant was justified in pepper spraying Plaintiff.  Defendant

14   states his other goal in pepper spraying Plaintiff was to stop "Plaintiff's attempts to attack

15   responding staff on scene."  (ECF No. 38-1 at 7.)  While Plaintiff admits to being verbally hostile

16   towards responding officers, Plaintiff states he never made any physical gestures towards officers.

17   (ECF No. 38-3 at 25–26.)  Additionally, it is not clear based upon the record whether officers

18   were ever in danger of being struck by Plaintiff.  At all times, responding officers were between

19   three and six feet away from Plaintiff.  (ECF No. 38-4 at 2–3.)  Moreover, there was guardrail

20   between Plaintiff and responding officers.  Based on this evidence, it is unclear whether Plaintiff

21   posed a threat to Defendant or other responding officers.

22          Fourth, it is, however, undisputed Defendant and others tried to temper the severity of

23   their forceful response by allowing Plaintiff to eventually decontaminate and receive medical

24   treatment.  (ECF No. 38-4 at 3.)

25          Fifth and finally, the Court finds Plaintiff's injuries caused by the pepper spray and

26   subsequent fall were significant.  In addition to enduring the temporary pain and irritation caused

27   by being pepper sprayed in the face, Plaintiff alleges he now suffers from chronic back pain and

28

1 panic attacks after falling from the second tier to the lower tier.⁵  (ECF No. 1 at 3.)

2 After weighing these factors, the Court finds a jury could conclude Defendant did not pepper spray Plaintiff out of a good-faith effort to maintain or restore discipline.

4 Accordingly, the Court DENIES summary judgement as to Plaintiff's Eighth Amendment claim.

### B. Supplemental State Law Claim

Plaintiff seeks damages for Defendant's alleged violation of Article 1, Section 17 of the California Constitution which states, "Cruel or unusual punishment may not be inflicted or excessive fines imposed."  *See* ECF No. 1; Cal. Const. Art.1 § 17.⁶  However, there is no private cause of action for damages under the California cruel and unusual punishment clause set out in Article 1, Section 17.  *Davis v. Kissinger*, No. CIV S–04–0878 GEB DAD P, 2009 WL 256574, at *12 n. 4 (E.D. Cal. Feb. 3, 2009) (citing *Giraldo v. Cal. Dep't Corrs. & Rehab.*, 168 Cal. App. 4th 231, 253–56 (2008)).

Accordingly, the Court GRANTS summary judgment as to Plaintiff's supplemental state law claim.

### C. Qualified Immunity

Defendant contends he is entitled to qualified immunity against Plaintiff's claims. (ECF No. 38-1 at 10.)  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  In determining whether a state official is entitled to

---

⁵ The record indicates responding officers placed mattresses on the lower tier below Plaintiff. (*See* ECF No. 38-5 at 3.)  These mattresses appear to have mitigated Plaintiff's injuries.

⁶ Defendant agrees and the Court finds it has supplemental jurisdiction over Plaintiff's state law claims.  28 U.S.C. § 1367 grants federal courts supplemental jurisdiction over claims where no original jurisdiction exists.  *See generally* 28 U.S.C. § 1367.  Section 1367(a) provides "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  *Id*.  In the instant case, the underlying facts of Plaintiff's state law claim are directly related to Plaintiff's Eighth Amendment claim.

qualified immunity in the context of summary judgment, we consider (1) whether the evidence viewed in the light most favorable to the plaintiff is sufficient to show a violation of a constitutional right and (2) whether that right was "clearly established at the time of the violation." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019) (citing Pearson, 555 U.S. at 232, 129 S.Ct. 808).

The Court already determined there is a triable issue of material fact as to whether Defendant violated Plaintiff's Eighth Amendment rights, and thus Defendant is not entitled to qualified immunity at this stage of proceedings. *Id*. However, the Court also finds there is a triable issue of material fact as to whether Plaintiff's right to safety was clearly established at the time of the violation. *Id*.

Officials are charged with knowing the laws governing their conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982). The Supreme Court rejects the proposition an Eighth Amendment right is only clearly established when prior cases have addressed facts "materially similar" to those in the case at issue. *Hope v. Peltzer*, 536 U.S. 730, 739 (2002); *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) ("[T]here can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."). That the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment is well established. *Whitley v. Albers*, 475 U.S. 312, 319, (1986). It is similarly well-established prison officials may not ignore known or obvious risks of substantial harm to health or safety. *Farmer*, 511 U.S. at 834–37.

Defendant contends he is entitled to qualified immunity because neither he "nor any other reasonable prison official would have known that complying with orders and pepper spraying Plaintiff during a suicide attempt would violate the Eighth Amendment." (ECF No.38-1 at 11–12.) However, the Court finds reasonable minds could differ as to whether Defendant ignored a known or obvious risk of substantial harm to Plaintiff's health and safety. When Defendant pepper sprayed Plaintiff in the face, Plaintiff was standing on the ledge of the second tier with a noose around his neck and his hands on the guardrail to keep his balance. (ECF No. 38-3 at 9.) When someone is pepper sprayed in the face, it is almost certain they will use their hands to either

1  shield their face from being pepper sprayed again or to wipe the residue off their face.  Further,

2  the record clearly establishes when Plaintiff previously removed his hands from the guardrail, he

3  would lose his balance.  (ECF No. 38-4 at 2.)  Thus, a jury could conclude Defendant ignored a

4  known or obvious risk Plaintiff would lose his balance and either hang himself or fall to lower tier

5  when he pepper-sprayed Plaintiff in the face.

6  Confronted with these circumstances, the Court finds there is a triable issue of material

7  fact as to whether Plaintiff's right to safety was clearly established at the time of the violation.

8  Accordingly, Defendant is not entitled to qualified immunity at this stage of proceedings.

### IV. CONCLUSION

10  For the foregoing reasons, the Court DENIES Defendant's Motion for Summary

11  Judgment as to Plaintiff's Eighth Amendment claim but GRANTS Defendant's Motion for

12  Summary Judgment as to Plaintiff's supplemental state law claim.  (ECF No. 38.)  The matter is

13  referred back to the magistrate judge.

14  IT IS SO ORDERED.

15  Date:  September 15, 2023

_____
Troy L. Nunley
United States District Judge